## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

RANDY PAUL GUESS         *    CIVIL ACTION NO.  15-2318

VERSUS                 *    JUDGE ROBERT G. JAMES

CAROLYN W. COLVIN, ACTING     *    MAG. JUDGE KAREN L. HAYES
COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice**.**

### Background & Procedural History

Randy Guess protectively filed the instant applications for Title II Disability Insurance Benefits on June 17, 2013.  (Tr. 124-130).  He alleged disability as of October 23, 2012, because of two back surgeries, bilateral knee surgery, and right shoulder surgery.  (Tr. 149, 160).  The state agency denied the claim at the initial stage of the administrative process.  (Tr. 51-62).  Thereafter, Guess requested and received a May 7, 2014, hearing before an Administrative Law Judge ("ALJ").  (Tr. 20-44).  However, in a July 17, 2014, written decision, the ALJ determined that Guess was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that exists in substantial numbers in the national economy.  (Tr. 6-16).  Guess appealed the adverse decision to the

Appeals Council.  On July 21, 2015, however, the Appeals Council denied Guess's request for review; thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. 1-3).

On September 2, 2015, Guess filed the instant complaint for review before this court. Succinctly restated, he alleges the following errors,

1)    For various reasons, the ALJ's residual functional capacity assessment is not supported by substantial evidence; and

2)    The ALJ failed to meet his burden at step five of the sequential evaluation process.

### Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

2

**Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

3

> (5)     If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*,  239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### The ALJ's Findings

**I.      Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period.  (Tr. 11).  At step two, he found that claimant suffers severe impairments of lumbar disc degeneration, disc bulging at the L5 level, and sacroiliac neuropathy.  *Id*.  He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  *Id*.

**II.     Residual Functional Capacity**

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform sedentary work, limited by the ability to only occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds, and only occasionally balance, kneel, stoop, crouch,

and crawl.  (Tr. 12-14).[1]

## III.   Steps Four and Five

The ALJ concluded at step four of the sequential evaluation process that Guess was unable to perform his past relevant work.  (Tr. 14).  Accordingly, he proceeded to step five.  At this step, the ALJ determined that the claimant was a younger individual, with at least a high school education, and the ability to communicate in English.  *Id*.  Transferability of skills was not material to the determination of disability.  (Tr. 14-15).

He then observed that given the claimant's vocational factors, and if he had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled.  20 C.F.R. § 404.1569; Rule 201.28.  (Tr. 15).  However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent his additional limitations eroded the occupational base for unskilled work at all exertional levels.  (Tr. 15, 40-43).  In response, the VE identified the representative jobs of surveillance system monitor – sedentary, *Dictionary of Occupational Titles* ("DOT") Code # 379.367-010; telephone quotation clerk – sedentary, DOT Code # 237.367-046; and document preparer, DOT # 249.587-018, that were consistent with the ALJ's RFC and the claimant's vocational profile.  *Id*.

The VE testified that for the surveillance system monitor job, there were 79,000 positions

---

[1]  Sedentary work entails:
> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

nationally and 1,300 positions regionally.  (Tr. 15, 40-43).  For the telephone quotation clerk job, there were 997,000 positions nationally and 19,000 regionally.  *Id*.  For the document preparer job, there were 2,828,140 positions nationally and 35,470 positions regionally.  *Id*.  This incidence of work constitutes a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

Accordingly, the ALJ concluded that the claimant was able to make a successful adjustment to other work that exists in significant numbers in the national economy.  (Tr. 15).  A finding of "not disabled" necessarily ensued.  *Id*.

<u>Analysis</u>

**I.     Residual Functional Capacity**

    a)     <u>Chronology of the Medical Record</u>

        i)     <u>Douglas Brown, M.D.</u>

On October 29, 2012, Guess began treating with Dr. Brown as result of worsening low back pain following an October 23, 2012, incident at work when his foot slipped off of a truck bumper.  (Tr. 224-225).  He described his pain as constant, but worse with lying down, standing, sitting, bending, and arising from a chair.  *Id*.  His lower back pain was worsening with pain radiating to the buttocks.  *Id*.  His pain was 7/10, with an average pain level of 10.  *Id*.  Straight leg raise was negative bilaterally.  *Id*.  Brown diagnosed acute L5-S1 disc injury with S1 neuropathy and possible cauda equina syndrome.  *Id*.  He took Guess off of work.  *Id*.[2]

Guess returned to Dr. Brown on November 5, 2012.  (Tr. 226-227).  Straight leg test was

---

    [2]  An October 29, 2012, MRI of the lumbar spine showed mild straightening of the normal lumbar lordosis.  (Tr. 221). At the L5-S1 level, there was minimal posterior disc bulging, but no significant compression of the nerve roots.  *Id*.

positive on the left side.  *Id*.  Brown diagnosed L5 bulging disc and S1 neuropathy.  *Id*.  He prescribed Ultram and Tramadol.

Guess returned to Dr. Brown on November 13, 2012.  (Tr. 228-229).  Straight leg test was positive on the left.  *Id*.  Brown scheduled Guess for a steroid injection at L5-S1.

On November 28, 2012. Guess reported to Dr. Brown that the injection had decreased his pain by about 15-20 %.  (Tr. 231-232).

Guess returned to Dr. Brown on December 21, 2012, for a re-check following bilateral L5-S1 steroid injections administered on December 8, 2012.  (Tr. 233-235).  He reported that he still experienced pain across his entire low back, with weakness and fatigue in his lower extremities.  *Id*.  However, his buttock, hip, and leg pain continued to improve since the second injection.  *Id*.  He estimated that his pain had improved by 30 %.  *Id*.

Guess returned to Dr. Brown on January 22, 2013.  (Tr. 236-237).  He reported that his pain was intermittent (i.e., present 50% of the time).  *Id*.  It was worse with sitting.  *Id*.  However, his lower back pain was improving.  *Id*.  He had received a third injection on January 5, 2013, which had reduced his pain by 50 percent.  *Id*.  Straight leg test was negative bilaterally.  *Id*.  Brown diagnosed lumbar disc degeneration, bulging lumbar disc at L5, S1 neuropathy, and prior L4-5 fusion.  *Id*.  He released Guess to return to work full duty.  *Id*.

On February 26, 2013, Dr. Brown once again saw Guess for his low back pain.  (Tr. 238-240).  Guess reported that his pain was intermittent and worse with sitting.  *Id*.  He stated that his legs still felt weak and fatigued, with his right leg pain rated as a 4/10.  *Id*.  He was not currently working because he had been fired.  *Id*.  His pain had decreased from a ten to a two after steroid injections, but he still had occasional right leg ;pain.  *Id*.  He took Flexeril and Lortab.  *Id*.  Upon examination, straight leg testing was negative.  *Id*.  Brown documented that Guess should

consider retraining for a light physical job.  *Id.*

Guess returned to Dr. Brown on April 9, 2013.  (Tr. 241-242).  Straight leg test of the left leg was positive.  *Id.*  Brown explained to Guess his orthopedic goals and options, and then referred him to pain management for discogenic L5 pain.  *Id.*  He cryptically noted, "off work." *Id.*  Brown advised Guess to return to the clinic if his condition worsened or new symptoms arose.  *Id.*

Guess returned to Dr. Brown on May 30, 2013.  (Tr. 243-245).  He reported no relief with physical therapy or epidural steroid injections.  *Id.*  His lower back pain was improving, but radiated to the posterior left leg.  *Id.*  He also had leg weakness when walking or standing for long periods.  *Id.*  He exhibited no gait abnormality.  *Id.*  Recent discograms had been very painful, with the pain lasting for three days.  *Id.*  A lumbar lumbosacral spine examination was normal.  *Id.*  His muscles were normal.  *Id.*  Brown noted that Guess was not fit for work at his regular job, rather only sedentary work.  *Id.*  He offered surgery, but Guess was reluctant.  *Id.*  Brown noted that non-operative pain management had failed, and that Guess needed to be scheduled for surgery.  *Id.*  Guess assured Dr. Brown, however, that he had intractable, incapacitating pain only twice per month.  *Id.*  Brown replied that the surgery was elective.  *Id.*

Guess returned to Dr. Brown on July 11, 2013.  (Tr. 246-248).  His active problems were a fall; bulging intervertebral disc lumbar – L5; intervertebral disc degeneration — lumbar; and lower back pain – worsening.  *Id.*  His pain was constant, and worse with just about any activity or position.  *Id.*  He was not back at work, and did not expect to return to work again.  *Id.*

ii)      John Ledbetter, M.D.

On May 20, 2013, Guess underwent a lumbar discography at L5-S1, L3-4, L2-3, and L1-2.  (Tr. 214-215).  All four levels examined were painful, so there was no negative control.  *Id.*

8

Guess returned to John Ledbetter, M.D. on May 28, 2013.  (Tr. 216-217).  At that time, he rated his pain as a three on a ten point scale.  *Id*.  However, his pain worsened with increased activity.  *Id*.  He had good days and bad days with his pain.  *Id*.  That day was a not-so-bad day.  *Id*.  He had a history of prior back surgery x2, left and right knee surgeries, and right shoulder surgery.  *Id*.  He took Lortab 10 mg. up to three times per day.  *Id*.  Ledbetter started him on Neurontin 300 mg. once per day at bedtime.  *Id*.  He noted that Guess might benefit from left-sided medial branch blocks for diagnostic purposes.  *Id*.  Upon examination, his back extensions and forward bend were limited secondary to pain.  *Id*.  Seated straight leg raising was positive on the left; negative on the right.  *Id*.  His gait was antalgic left.  *Id*.  Ledbetter advised Guess to resume his normal activities as early as possible.  *Id*.

Guess returned to Dr. Ledbetter on June 27, 2013.  (Tr. 218-220).  He had suffered a recent exacerbation of his back pain while working on the swimming pool.  *Id*.  The episode lasted four days.  *Id*.  Deep tendon reflexes were physiologic.  *Id*.  He exhibited diminished sensation to pinprick to the left leg in an L5 dermatomal pattern.  *Id*.  He also had left SI joint tenderness with positive Fortin's finger test to the left SI joint.  *Id*.  He demonstrated significant tenderness to palpation of his lumbar spine from the L1 area down at the facet joints areas.  *Id*.  Straight leg test was positive on the left.  *Id*.  He reported that Neurontin had not provided any relief.  *Id*.  He had been out of Lortab for one week.  *Id*.  He was a candidate for bilateral medial branch blocks for diagnostic purposes.  *Id*.

Guess returned to Dr. Ledbetter on September 23, 2013.  (Tr. 272-273).  He rated his pain as a 5/10.  *Id*.  Guess stated that he was not proceeding with the surgery recommended by Dr. Brown.  *Id*.  On occasion, he experienced pain radiating down his left leg.  *Id*.  80 percent of his problem was back pain.  *Id*.  Straight leg raise test was negative bilaterally.  *Id*.

9

Guess returned to Dr. Ledbetter on October 21, 2013, with complaints of low back and leg pain.  (Tr. 274-276).  He rated his pain as a 6/10, with more pain into his left, posterior lower extremity.  *Id*.  His pain increased with activity, but he denied weakness in his extremities.  *Id*.

On November 4, 2013, Dr. Ledbetter administered a two level transforaminal epidural steroid injection. (Tr. 277).

Guess returned to Dr. Ledbetter on December 5, 2013.  (Tr. 280-281, 304).  He rated his pain as a 3/10.  *Id*.  He felt great for about five days after the latest steroid injections.  *Id*.  He continued to have good and bad days.  *Id*.  That day was a fairly good day.  *Id*.  He took his medication, as needed, without side effects.  *Id*.  He admitted that he did not take Lortab on a daily basis.  *Id*.  In fact, his previous drug screen was inconsistent with Lortab.  *Id*.  Another drug test for Lortab was administered that day, but came back negative.  *Id*.  Guess admitted that his last dose of Lortab had been five days earlier.  *Id*.  Accordingly, Ledbetter decreased Guess's dosage of Lortab to once per day.  *Id*.  Guess was "okay with this decision."  *Id*.  Ledbetter diagnosed lumbar spondylosis, without myelopathy; post-laminectomy syndrome, lumbar; radiculitis, thoracic or lumbar; and intervertebral disc D/O W/myelopathy, lumbar.  *Id*.

Guess underwent steroid injections on December 18, 2013.  (Tr. 283).

Guess returned to Dr. Ledbetter on January 15, 2014.  (Tr. 286-287).  He reported that he had at least a 60 percent reduction of left leg pain for one week after his latest steroid injection.  *Id*.  He described pain that was starting to return and radiate down the back of the lower extremity to the foot.  *Id*.  He described it as a burning and stinging sensation that was aggravated with walking and standing.  *Id*.  He was taking Neurontin up to five times daily and Lortab four times per day, as needed.  *Id*.  Some days he did not take Lortab, and some days he took two to three.  *Id*.  He was not interested in surgical intervention.  *Id*.  He rated his pain as a

four.  *Id*.

Guess returned to Dr. Ledbetter for follow-up on February 12, 2014.  (Tr. 288-289).  He reported that he continued to have significant low back pain and left lower extremity pain that had been severe lately.  *Id*.  His pain was worse with activity, and even hurt sitting and lying down.  *Id*.  He rated his pain as a 5/10.  *Id*.  He reported some weakness and numbness in the left lower extremity.  *Id*.  He wanted to proceed with spinal cord stimulation.  *Id*.  Seated straight leg raise was positive on the left.  *Id*.  Ledbetter diagnosed post-laminectomy syndrome with chronic lumbosacral radiculitis; secondary myofascial pain; and status post-two lumbar surgeries, including L4-5 fusion and instrumentation.  *Id*.  Ledbetter noted that Guess was not working.  *Id*.  He did not "feel" that he was a candidate for any type of work level at that time.  *Id*.  However, following a successful spinal cord stimulator implantation, he hoped that he would qualify for sedentary to light work.  *Id*.

iii)   Malcolm Brahms, M.D.

On May 27, 2014, the ALJ sent interrogatories to non-examining medical expert, Malcolm Brahms, M.D.  *See* Tr. 309.  On  June 3, 2014, Dr. Brahms responded to the interrogatories and completed a medical source statement.  (Tr. 309-321).  He noted, *inter alia*, that there was evidence that Guess had not properly complied with prescribed treatment.  *Id*.  In addition, treatment had been prescribed that reasonably could be expected to improve his condition.  *Id*.  Dr. Brahms indicated on the medical source statement that Guess could frequently lift up to 20 pounds and frequently carry 10 pounds, and occasionally up to 20 pounds.  *Id*.  He could sit and stand for up to one hour at a time, and walk for 30 minutes at a time.  *Id*.  He could sit for a total of six hours in a day, stand for four hours in a day, and walk for two hours in a day.  *Id*.  He occasionally could push/pull with his upper extremities and

11

frequently reach overhead.  *Id*.  He occasionally could operate foot controls.  *Id*.  He also could

never climb ladders or scaffolds, crouch, or crawl, but occasionally could climb stairs, balance,

stoop, and kneel.  *Id*.  He needed to avoid unprotected heights, moving mechanical parts, and

vibrations, but occasionally could be exposed to humidity, with frequent exposure to operating a

motor vehicle and temperature extremes.  *Id*.  He also could tolerate moderate office noise.  *Id*.

Brahms also restricted Guess from lifting below waist level.  *Id*.

b)    Discussion

In his decision, the ALJ reviewed the available evidence, including the hearing

testimony, the medical treatment history, and the findings of the treating and non-examining

physicians.  (Tr. 12-14).  In deriving plaintiff's RFC, the ALJ resolved the opinion evidence as

follows,

> Malcolm Brahms, M.D., a medical expert, submitted answers to interrogatories on
> June 3, 2014.  He indicate that the claimant could only lift and/or carry up to 20
> pounds, stand for 4 hours, walk for 2 hours and sit for 6 hours in an 8-hour
> workday with additional manipulative, postural and environmental limitations.
>
> The undersigned granted significant weight [sic] the opinion of Dr. Brahms as it
> is consistent with the objective evidence of record showing that he ambulated
> without any assistive device, he had no muscle spasms, and that straight leg
> raising was negative bilaterally.  It is also supported by the MRI of his lumbar
> spine showing minimal disc bulging at the L5-S1 and no evidence of nerve root
> compression.
>
> The undersigned also granted significant weight to the opinion of Dr. Brown that
> the claimant could perform sedentary work.  As the claimant's treating physician,
> Dr. Brown is considered reliable in assessing the nature and severity of the
> claimant's condition.
>
> However, the undersigned granted little weight to the opinion of Dr. Ledbetter
> that the claimant was not a candidate for any type of work level.  His opinion is
> quite conclusory, providing very little explanation of the evidence relied on in
> forming that opinion.

(Tr. 13-14) (citations omitted).

In other words, the ALJ credited the impression of plaintiff's treating orthopedist, together with the more-detailed assessment of the non-examining medical expert, in lieu of the conclusory statement that plaintiff was unable to work, offered by plaintiff's treating pain management specialist.  Plaintiff, for various reasons, cries foul.

He first contends that the ALJ impermissibly rejected the opinion of his treating physician, Dr. Ledbetter, without good cause.  The court recognizes that

> "ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). **The treating physician's opinions, however, are far from conclusive. "[T]he ALJ has the sole responsibility for determining the claimant's disability status.**" *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir.1990).
>
> **Accordingly, when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony**. The good cause exceptions we have recognized include disregarding statements that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence. *Scott*, 770 F.2d at 485. In sum, the ALJ "is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly." *Id.*; see also 20 C.F.R. § 404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have.").

*Greenspan*, 38 F.3d at 237 (emphasis added).

Here, the ALJ rejected Dr. Ledbetter's statement because it was conclusory, with little explanation of the evidence to support the statement.  (Tr. 14)  Of course, a physician's statement that a claimant is "disabled" or "unable to work" is not accorded any special significance under the regulations.  *See* 20 C.F.R. § 404.1527(d)(1)-(3); *Frank v. Barnhart*, 326

F.3d 618 (5th Cir. 2003).  Furthermore, the lack of corroborative evidence in the treatment records is a valid reason for discounting a physician's opinion.  *See Ward v. Barnhart*, 192 Fed. Appx. 305, 308, 2006 WL 2167675 (5th Cir. 08/02/2006) (unpubl.); *see also Nugent v. Astrue*, 2008 WL 2073891 (5th Cir. May 16, 2008) (ALJ entitled to discount treating physician's conclusory statement because it contradicted earlier treatment notes, objective medical findings, and other examining physicians' opinions); *Richard ex rel. Z.N.F. v. Astrue*, 2012 WL 2299479 (5th Cir. June 15, 2012) (unpubl.) (ALJ may discredit physician's opinion by pointing to contrary evidence, albeit however tersely); *Garth v. Astrue*, 393 F. App'x 196, 199 (5th Cir. Aug. 26, 2010) (unpubl.) (court noted that ALJ *could have* discounted treating physician's opinion because the opinion contradicted his own treatment notes and the claimant's admissions); *Vansa v. Astrue*, 423 F. App'x 381, 383 (5th Cir. April 20, 2011) (unpubl.) (upholding ALJ's decision to discount treating physician's opinion because, as the ALJ explained, it was "not supported by the objective findings of his own clinic notes nor by the evidence as a whole.").

    Plaintiff further contends that, before rejecting Dr. Ledbetter's opinion, the ALJ was required to perform a detailed analysis of the considerations set forth in 20 C.F.R. § 404.1527. *See Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000).  However, the ALJ need not perform a detailed analysis of § 404.1527(c) factors where, as here, the record contains reliable medical evidence from another examining physician, i.e., Dr. Brown.  *See Newton, supra*; *Holifield v. Astrue*, 402 Fed. Appx. 24 (5th Cir. Nov. 10, 2010) (citation omitted); *Bullock v. Astrue*, 2007 WL 4180549 (5th Cir. 11/27/2007) (unpubl.).

    Recognizing this, plaintiff argues that the ALJ erred by relying on Dr. Brown's May 2013 opinion that he was capable of sedentary work because the opinion was "stale."  He emphasizes that, after July 2013, he was treated exclusively by Dr. Ledbetter, and did not return

again to Dr. Brown.  In addition, he argues that his condition deteriorated since the date of Dr. Brown's assessment.

Upon review of the medical record, however, it is apparent that plaintiff's symptoms waxed and waned.  In May 2013, he assured Dr. Brown that he experienced incapacitating pain only twice per month.[3]  Morever, although his low back pain seemed to be improving in May 2013, plaintiff told Dr. Brown that physical therapy and steroid injections provided no long-term relief, and that he still experienced radiating pain to the posterior leg, together with leg weakness when walking or standing for long periods.  Despite these complaints, Brown opined that he was capable of sedentary work.  Plaintiff described similar symptoms to Dr. Ledbetter in late 2013 and early 2014.

The court further notes that in October and December 2013, plaintiff tested negative for Lortab use.  In January 2014, he admitted to Dr. Ledbetter that some days he did not take any Lortab at all.  Certainly, if the pain were as debilitating and constant as plaintiff sometimes professed, it stands to reason that he would have taken his prescribed pain medication on a more regular basis.  Moreover, plaintiff had elected not to undergo the surgery recommended by Dr. Brown, and, at the hearing, stated that he had declined to proceed with the spinal cord stimulator implantation.  (Tr. 32).  The regulations provide that a claimant will not be found disabled if he fails, without good reason, to follow prescribed treatment.  20 C.F.R. §§ 404.1530.  While the ALJ did not base his finding of "not disabled" on plaintiff's failure to follow prescribed treatment, he noted Guess's reluctance to undergo these additional procedures, which detracted from his credibility.  (Tr. 14).

Plaintiff next contends that the ALJ erred by failing to re-contact Dr. Brown to obtain an

---

[3]  Albeit, he did not say how long these episodes lasted.

updated opinion of his condition.  The regulations formerly required the Commissioner to recontact a claimant's treating physician under certain circumstances.  *See* 20 C.F.R. § 404.1512(e) (2011).  As of 2012, however, the Commissioner *may* recontact a medical source if the Commissioner is unable to render a decision because the evidence is insufficient or inconsistent.  20 C.F.R. § 404.1520b (2016).

Regardless, however, an ALJ's failure to recontact a physician or to adequately develop the record does not automatically compel reversal.  *Hyde v. Astrue*, Docket No. 07-30748 (5th Cir. May 12, 2008) (unpubl.) (citing *Kane v. Heckler*, 731 F.2d 1216 (5th Cir. 1984)).  To obtain reversal because of an ALJ's failure to adequately develop the record, the claimant also must demonstrate resulting prejudice.  *Brock v. Chater*, 84 F.3d 726 (5th Cir. 1996).  "To establish prejudice, a claimant must show that [he] could and would have adduced evidence that might have altered the result."  *Id.*  (internal quotation marks omitted).  Mere speculation that additional evidence might have made a difference does not suffice.  *Hyde, supra*.  Plaintiff has not made that showing here.

In an effort to clarify any insufficiencies or inconsistencies in the instant record, the ALJ – as he is authorized to do – consulted a non-examining medical expert, Dr. Brahms.  *See* 20 C.F.R. §§ 404.1520b(c)(4), 404.1527(3)(2)(iii); Hearings, Appeals and Litigation Law Manual ("HALLEX") I-2-5-34.  Plaintiff argues that the ALJ impermissibly credited the findings of a non-examining physician over the impression of his treating physician, Dr. Ledbetter.  Indeed, it is axiomatic that "an ALJ may properly rely on a non-examining physician's assessment when . . . those findings are based upon a careful evaluation of the medical evidence and do not contradict those of the examining physician." *Carrier v. Sullivan*, 944 F.2d 243, 246 (5th Cir.1991) (quoting, *Villa v. Sullivan,* 895 F.2d 1019,1024 (5th Cir. 1990)) (emphasis added).

Here, however, Dr. Ledbetter issued but a conclusory statement that plaintiff was "unable to work." Furthermore, Dr. Brahms' assessment is consistent with the impressions of plaintiff's treating orthopedist, Dr. Brown. Insofar as plaintiff harbored any reasonable doubts concerning the bases or soundness of Dr. Brahms' opinions, he could have exercised his right to cross-examine him. *See* Tr. 210-211; *Lidy v. Sullivan*, 911 F.2d 1075, 1077 (5th Cir. 1990) (claimant enjoys right to cross-examine physician).

In his reply brief, plaintiff argues that Dr. Brahms' assessment is internally inconsistent because if, after one hour of continuous sitting, plaintiff has to stand for one hour and then walk for 30 minutes, he necessarily will be precluded from sitting for a total of six hours in one day. (Reply Memo., pg. 4 (citing Tr. 315)). However, Dr. Brahms did not say that plaintiff needed to stand for one hour at a time in between his one hour sitting maximum. Rather, he simply opined that plaintiff could stand for up to one hour at a time, without interruption. Thus, in effect, Brahms assigned a sit/stand limitation.[4] Insofar as the ALJ erred by failing to adopt a sit/stand option in his RFC any error was harmless because the VE opined that a sit/stand option would not affect the representative jobs. (Tr. 42-43); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights).[5]

In sum, the court finds that the ALJ provided good cause, supported by substantial evidence, to favor the opinions of Drs. Brown and Brahms over that of Dr. Ledbetter. *See*

---

[4] Plaintiff also testified that, on a good day, he could sit for up to two hours at a time before needing to move. (Tr. 34-35). On a bad day, he was "up and down a good bit." *Id*. Furthermore, he could stand between 45 minutes to one hour, depending on whether he was having a good or bad day. *Id*.

[5] Dr. Brahms recognized other postural and environmental limitations that the ALJ did not incorporate into his RFC. Plaintiff, however, neither raised this issue, nor otherwise demonstrated that these additional limitations materially affected the ALJ's decision.

17

*Pineda v. Astrue*, 289 Fed. Appx. 710, 713 (5th Cir.2008) (the ALJ was justified in accepting the testimony and findings of some physicians, including a medical expert, over others). Accordingly, the court further finds that the ALJ's residual functional capacity assessment is supported by substantial evidence.

**II.     Step Five**

Finally, plaintiff contends that the ALJ erred in his step five determination because he ignored the VE's testimony that if a hypothetical claimant had to take more than the usual number of breaks during a work day, then he would be unable to perform any jobs in the national economy.  (Tr. 43).  However, the ALJ's testimony on the effects of additional or different limitations, not adopted by the ALJ in his RFC, prove immaterial, so long, as here, his RFC is supported by substantial evidence.  *See* discussion, *supra*; *Vaught v. Astrue*, 271 Fed. Appx. 452, 456 (5th Cir.2008) (plaintiff's argument amounts to a disagreement with the ALJ's RFC, but that determination was supported by substantial evidence).[6]  Plaintiff's assignment of error lacks merit.

### Conclusion

The ALJ in this case was tasked with determining whether plaintiff was disabled.  In so doing, he considered the claimant's testimony, the medical record, and expert opinion evidence. The evidence was by no means uniform and could have supported a different outcome.  Such conflicts in the evidence, however, are for the Commissioner to resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try the issues

---

[6]  A hypothetical need only reasonably incorporate the disabilities and limitations recognized by the ALJ.  *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994).

de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).[7]  That is not to say that the ALJ's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant is not disabled under the Social Security Act, is supported by substantial evidence and remains free of legal error.  Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL**

---

[7]  Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below."  *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted).  One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result.  *Id.*  This exception is applicable here.

**FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 15th day of July 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE